IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>vs. )<br>)<br>LOUIS H. EARLY ) | Case No. 09 CR 282 |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Louis H. Early has filed a motion seeking release under 18 U.S.C. § 3582(c)(1)(A) or a recommendation for immediate release on home confinement. The Court grants the motion for early release and reduces Mr. Early's prison sentence to time served, thus rendering moot his request for a recommendation for immediate release on home confinement. But the sentence reduction is conditioned upon a modification of Mr. Early's supervised release conditions to require a six-month period of home confinement.

In 2009, Mr. Early committed two bank robberies, on one of which he was armed. His son, Louis S. Early, served as the getaway driver for the first robbery and actively assisted in the second, which took place at a bank where Louis S. worked. The proceeds of the two robberies totaled over $70,000.

In 2010, Mr. Early pled guilty to two counts of bank robbery under 18 U.S.C. § 2113(a) and one count of using a firearm in connection with a crime of violence under 18 U.S.C. § 924(c)(1)(A). A now-retired judge of this court sentenced him to a prison term of 160 months, a little over thirteen years. Mr. Early, who was in custody

continuously from the date of his arrest on May 1, 2009, has served nearly all of his prison time, and he is scheduled to be released to a residential reentry center (RRC) in about seven weeks, on June 23, 2020, and then to home confinement on August 25, 2020. His ultimate release date is February 25, 2021, a little under ten months from now.

In October 2018, Mr. Early filed a motion seeking a judicial recommendation under the Second Chance Act for a longer-than-usual placement in an RRC (what is sometimes called a "halfway house"), specifically nine months. This Court denied the motion, saying this: "The Court appreciates Mr. Early's contentions regarding his need for a longer reentry placement, but it must balance this with the issue of community safety, and given his significant history of recidivism the Court declines to recommend a longer-than-usual reentry placement." Order of Mar. 19, 2019 (dkt. no. 103). The Court notes that if it had made the requested recommendation and the Bureau of Prisons had then followed it, Mr. Early would have been released to an RRC nine months before the end of his prison sentence. It is noteworthy that the Bureau of Prisons itself later granted Mr. Early almost that much, permitting his release to an RRC eight months before the end of his sentence. Perhaps more significantly, the Bureau of Prisons directed that Mr. Early actually would spend only two months in an RRC (June 23 to August 25) before being released to home confinement, which is of course far less restrictive than an RRC.

Mr. Early has now filed a motion seeking immediate release under section 603(b) of the First Step Act, which amended 18 U.S.C. § 3582(c)(1)(A) to provide a greater role for courts in determining whether to reduce a defendant's sentence based on

2

"extraordinary and compelling reasons" warranting a reduction. As amended, and as applicable here (Mr. Early is not over 70 years old), the statute provides that

> [t]he court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
>> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>>
>>> (i) extraordinary and compelling reasons warrant such a reduction;
>>>
>>> . . .
>>>
>> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). The government agrees that Mr. Early has exhausted internal Bureau of Prisons remedies. *See* Gov't's Suppl. to Resp. to Def.'s Mot. for Release (dkt. no. 128) at 1.

The first question is whether there are "extraordinary and compelling reasons" warranting a reduction. Mr. Early contends that the coronavirus outbreak poses a great risk to his health and life as long as he remains incarcerated. He is 62 years old. He suffers from several medical conditions, including diabetes and hypertension. And his counsel says that Mr. Early had a heart attack at some point when he was in custody at the Chicago Metropolitan Correctional Center. These conditions place Mr. Early in the category of those who face a higher risk of severe illness if they contract the

3

coronavirus. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 2, 2020). Mr. Early also contends that the conditions at FCI Terre Haute, where he is incarcerated, also put him at greater risk of contracting the virus. At present, there are no confirmed cases of coronavirus among either staff or incarcerated persons at the prison, *see* https://www.bop.gov/coronavirus/index.jsp (last visited May 2, 2020), but the Court has no solid information about how much testing has been done, and it is only fair to say that the fact that there are no confirmed cases does not mean that no one in the prison has contracted the coronavirus. And if and when that happens, it is likely to spread more quickly than in the general population due to, among other things, the difficulty of accomplishing social distancing in a prison environment and the constant influx of people coming and going from outside the prison, including correctional staff. On the other hand, it appears that the vast majority of those who contract coronavirus do not suffer serious illness, and many remain entirely asymptomatic.[1] That said, the Court cannot discount the risk to Mr. Early if he contracts coronavirus, as reliable information places him in a higher-risk category. This, in the Court's view, qualifies as an extraordinary reason warranting consideration of a reduction of Mr. Early's sentence.

The next question is whether a reduction "is consistent with applicable policy statements issued by the Sentencing Commission." The policy statements issued by the Sentencing Commission even before the passage of the First Step Act included an open-ended provision broad enough to cover the circumstances argued by Mr. Early.

---

[1] Mr. Early has not provided any information regarding the degree to which those in higher-risk categories are more likely to suffer serious illness if they contract the virus, and the Court is unaware of any reliable information along these lines.

4

*See* U.S.S.G. § 1B1.13, app. note 1(D).  *See, e.g., United States v. Reyes*, No. 04 CR 970, 2020 WL 1663129, at *2 (N.D. Ill. Apr. 3, 2020) (Leinenweber, J.).

Finally, section 3582(c)(1)(A) requires the Court to consider the factors regarding imposition of an appropriate sentence set forth in 18 U.S.C. § 3553(a).  These include Mr. Early's history and characteristics; the nature and circumstances of the crimes; due consideration of the seriousness of the crimes; promoting respect for the law; providing just punishment; affording adequate deterrence; protecting the public from further crimes by Mr. Early; and providing him with any necessary services and treatment.

Were the Court to reduce Mr. Early's sentence to time served, it would be cutting his overall sentence by a little over nine months, meaning that he would serve 133 months in custody as compared with 142.  And it would be cutting his *prison* sentence by only seven weeks.  It is difficult to imagine how a reduction this modest would disregard the seriousness of his crimes—which were indeed quite serious—or undercut the need to provide just punishment, respect for the law, or adequate deterrence.

The most significant factor here, in the Court's view, involves Mr. Early's criminal history and the need to protect the public from further crimes by him.  Mr. Early's presentence report reflects, it is fair to say, one of the worst histories of recidivism that this Court has seen in eighteen years as a lawyer and just over twenty as a judge.  The Court summarizes this in the paragraphs that follow.

Mr. Early was once employed as a police officer with the DuPage County's Sheriff's Office.  In 1984 he pled guilty to multiple charges of official misconduct for stealing money from the Clerk of the DuPage County Circuit Court and served about six months in custody, followed by probation.  He pled guilty in 1985-86 to several separate

5

charges of theft, one of them a felony theft charge, and was given a three-year prison sentence on the felony charge and jail sentences of three-plus months on each of two separate misdemeanor charges. In 1987, he pled guilty to stealing two automobiles from a dealership where he worked as a salesman and was given a prison sentence concurrent to his felony theft sentence. After he was paroled on the felony theft offense, and while on parole supervision, he forged a number of checks, apparently leading to revocation, in 1988, of his parole on the felony theft offense.

In 1989, Mr. Early, who had relocated to New York, was charged with grand larceny, apparently involving issuance of bad checks (though this is not completely clear from the presentence report in the present case). He pled guilty to grand larceny in 1990 and was sentenced a short prison term, followed by probation, which was revoked later in 1990 when he was arrested after committing a series of bank robberies. He was given a sentence of two to four years for the bank robberies. Not too long after he was paroled in 1995, he was again charged in New York with grand larceny, this time for embezzling money from his employer. His parole was revoked, and he ultimately pled guilty and was given another prison term.

Following his release from that prison term in 1997, Mr. Early's parole was revoked not once but twice. That year (1997), he swindled an elderly woman by telling her he would use the money she gave him ($4,100) to get her grandson out of prison on appeal and then just taking the money and doing nothing. He served additional prison time due to the parole revocation. His parole was revoked a second time when he was arrested in 1999 for grand larceny after stealing $5,600 that his employer had entrusted to him to pay distributors of the employer's product. This offense also led to a criminal

charge to which Mr. Early pled guilty in 2000 and received a prison sentence of 18 months to three years (it looks like he served the full three, until April 2003), followed by parole, which was later revoked for various violations, including passing a bad check in January 2004.

In March 2004, Mr. Early was arrested in New York for bank robbery, pled guilty, and was given another sentence of 18 months to three years. In 2005 he was charged with conspiracy to defraud the IRS in a case involving his preparation and filing, in 2002, of dozens of fraudulent tax returns in the name of fictitious companies, with refunds totaling over $130,000. He was sentenced to a federal prison term of 33 months, at least part of which seems to have been served concurrently with his state bank robbery sentence. He was released on federal supervised release in September 2008. Not too long after that, he returned to Illinois, where he committed the bank robberies that led to the sentence he is now serving.

In short, it is fair to say that for the past thirty-five years, Mr. Early has spent nearly all of his time serving jail or prison sentences and finding ways to get back into jail or prison. It is a dismal record. Mr. Early's counsel suggests that he committed the bank robberies for which he is now imprisoned because he was suffering from depression and under the influence of drugs. But that's just the most recent episode; it disregards the rest of his history. Most reasonable observers looking at Mr. Early's record would find it quite likely that he will commit additional crimes once he is released. Not that many people in their sixties commit crimes, but the same is true of people in their fifties, and Mr. Early was fifty-one when he committed the bank robberies for which he is now serving time. And although he has significant health conditions, there is

nothing to suggest that he is so frail to preclude further recidivism.

But the choices presented to the Court do not involve keeping Mr. Early in prison for an extended period versus releasing him now. He has almost completed his sentence, and the Bureau of Prisons itself has decided to release him to a halfway house just seven scant weeks from how, and to home confinement only two months later. So Mr. Early will very shortly be back in society, irrespective of what the Court does. The question, essentially, boils down to whether the Court should eliminate his last seven weeks in prison and his two months of halfway house confinement. (To be sure, under the plan approved by the BOP, Mr. Early would be on home confinement for six months after that, but the Court can replicate this by adding a home confinement condition to Mr. Early's supervised release, the terms of which he agrees the Court is entitled to modify in conjunction with early release from prison. *See* Def.'s Status Report of May 1, 2020 (dkt. no. 130).)

Cutting out the halfway house placement is not an inconsequential matter. Mr. Early has been in prison for a long time, and halfway house placement would facilitate his reentry to the community. In many situations, halfway house placement provides necessary lead time to permit a released offender to develop a plan for, among other things, where he is going to live and what he going to do once he leaves the halfway house. Were the Court simply being asked to fling open the doors to the prison and let Mr. Early walk out, it would be hesitant to do so even though the sentence reduction sought is not, in the scheme of things, a particularly large one. But that is not the case. Mr. Early's son has submitted a lengthy letter to the Court saying that he has been able to reconnect with his father during his time in custody and has developed a much

stronger and better bond. He has put together a plan for Mr. Early's release, including "clothes, housing, medical care and employment to ensure his entry back into society." Reply in Supp. of Def.'s Emerg. Mot. for Compassionate Release (dkt. no. 127), Ex. C. And although Mr. Early's son was his co-defendant in the robbery case, he has been out of prison for eight years, has obtained a bachelor's degree in criminal justice, and appears to have been completely rehabilitated.

For all of these reasons, though releasing Mr. Early is not without risk, the Court concludes after considering the relevant factors that a reduction of his sentence is appropriate so long as it is combined with a change to his supervised release conditions.[2] The risk to the public from Mr. Early's release from prison seven weeks early does not outweigh the risk to him from contracting the coronavirus while incarcerated, given the medical conditions that place him at a higher risk of serious illness. And Mr. Early should understand that the Probation Office and the Court will be monitoring him while on supervised release and that the Court will not hesitate to recommit him to prison should he again go astray.

## Conclusion

For the reasons stated above, the Court grants Louis H. Early's emergency motion for compassionate release [119] and also grants his motion for leave to file certain medical records under seal [124]. The Court reduces Mr. Early's prison sentence to time served and directs the Clerk to prepare an amended judgment and commitment order (J&C) accordingly. The amended J&C will also include a

---

[2] Mr. Early's supervised release conditions already require substance abuse testing and treatment and mental health treatment.

modification of the conditions of Mr. Early's supervised release to require him to spend the first six months of supervised release in home confinement, living with his son Louis S. Early, under the same conditions that would apply if he were on home confinement in connection with a Bureau of Prisons commitment to a Residential Reentry Center. The Court reminds Mr. Early that, as ordered in his previously-imposed conditions of supervised release, he must report to the Probation Office not less than 72 hours following his release. The Clerk is directed to send a copy of this order, as well as the amended judgment, to the Probation Office of this district.

Date: May 4, 2020

_____
MATTHEW F. KENNELLY
United States District Judge